OFFICE OF THE ATTORNEY GENERAL · STATE OF TEXAS


June 29, 2000

Ms. Cathy L. Hendricks, ASID/IIDA
Executive Director
Texas Board of Architectural Examiners
333 Guadalupe, Suite 2-350
Austin, Texas 78701-3942

Opinion No. JC-0244

Re: Whether a legislative appropriation for scholarships for architectural examination applicants established by section 7A of article 249a of the Revised Civil Statutes comports with article III, section 44 of the Texas Constitution, and related questions (RQ-0207-JC)

Dear Ms. Hendricks:

On behalf of the Texas Board of Architectural Examiners (the "Board"), you ask whether a legislative appropriation for scholarships for architectural examination applicants comports with article III, section 44 of the Texas Constitution. You also ask if the Board may contract with a private, nonprofit organization to administer the scholarship fund and if proposed rules regulating the awarding of scholarships impose sufficient controls for purposes of article III, sections 51 and 52 of the Texas Constitution. We conclude that because the legislative appropriation for the scholarship fund is supported by pre-existing law, section 7A of article 249a of the Revised Civil Statutes, the appropriation does not violate article III, section 44. We conclude, however, that the Board lacks statutory authority to enter into a contract with a private, nonprofit organization to award scholarships and disburse scholarship funds. Finally, in order to ensure that scholarship awards satisfy the dictates of article III, sections 51 and 52, the awards must serve the public purpose identified by the legislature. The Board's draft rule is sufficient to ensure that the public purpose identified by the legislature will be achieved.

The Board and the practice of architecture are governed by article 249a of the Revised Civil Statutes. *See* TEX. REV. CIV. STAT. ANN. art. 249a (Vernon Supp. 2000). Article 249a prohibits a person from practicing architecture unless he or she is registered with the Board as an architect. *See id.* §§ 1 (registration requirement); 6 (examination for registration); 10 (practice of architecture defined, exceptions); 12 (annual registration). Among its statutory duties under article 249a, the Board is required "to examine all applicants for a registration certificate for the practice of architecture," *id.* § 6(a), and to collect from each person applying for examination a fee prescribed by the Board, "which shall not exceed $300," *id.* § 6(b). An applicant for examination must present a diploma from a school of architecture approved by the Board and present evidence of "having had satisfactory experience in architecture, in the office or offices of one or more legally practicing architects." *Id.* § 7.

Your questions stem from a bill enacted by the Seventy-sixth Legislature, House Bill 1248, that added section 7A to article 249a, establishing a scholarship fund for architectural examination applicants. Section 7A requires the Board to deposit $10 of each certificate of registration renewal fee it collects to the credit of the scholarship fund for architectural examination applicants. *See id.* § 7A(a). The scholarship fund is an account in the general revenue fund that may be appropriated only to the Board to "(1) provide scholarships to persons applying . . . for examination; and (2) pay the Board's associated administrative costs." *Id.* The Board may not use more than 15 percent of the amount appropriated to the Board for the scholarship fund to pay the Board's administrative costs. *See id.* § 7A(c). The amount of each scholarship is "the lesser of $500 or the fee prescribed by the Board for the examination." *Id.* § 7A(d).

Subsection (e) of section 7A contains legislative findings regarding the public purpose of the scholarships:

> (e) The legislature finds that a public purpose of the state is served by the scholarships awarded under this section by:

>> (1) promoting the professional needs of the state;

>> (2) increasing the number of highly trained and educated registered architects available to serve the residents of the state;

>> (3) improving the state's business environment and encouraging economic development; and

>> (4) identifying, recognizing, and supporting outstanding applicants who plan to pursue careers in architecture.

*Id.* § 7A(e). Section 7A also authorizes the board to "establish and administer scholarships in a manner that the Board determines best serves the public purpose of the scholarships." *Id.* § 7A(f). It mandates that "[i]n determining what best promotes the public purpose, the Board shall consider at a minimum the financial need of each person applying for a scholarship under this section." *Id.* Finally, section 7A authorizes the Board to adopt rules to administer the scholarship fund. *See id.* § 7A(g) ("The Board shall adopt rules as necessary for the administration of this section.").

During the same session that the legislature enacted section 7A, the legislature also provided for a contingency appropriation for the scholarship fund in the General Appropriations Act. Section 9-11.21 of the 1999 General Appropriations Act provides as follows:

**Contingency Appropriation for House Bill 1248.** Contin-
gent upon the enactment of House Bill 1248, or similar legislation by

the Seventy-sixth Legislature, Regular Session, relating to the practice of architecture, landscape architecture and interior design, such sums as are collected pursuant to that Act, not to exceed $181,531 in fiscal year 2000 and $163,520 in fiscal year 2001, are appropriated to the Texas Board of Architectural Examiners for implementation of the provisions of the Act, including continuing education programs and scholarships for architectural examination applicants.

House Bill 1, Act of May 26,1999, 76th Leg., R.S., ch. 1589, § 9-11.21, 1999 Tex. Gen. Laws 5446, 6327.

You ask a number of questions about section 7A and the appropriation for scholarships. Your first question is whether "the appropriation of funds for the HB 1248 scholarships [is] valid in light of article III, section 44, of the Texas Constitution." Letter from Ms. Cathy L. Hendricks, ASID/IIDA, Executive Director, Texas Board of Architectural Examiners, to Honorable John Cornyn, Texas Attorney General at 3 (Mar. 24, 2000) (on file with Opinion Committee) [hereinafter "Request Letter"]. Article III, section 44 prohibits the legislature from making grants of money out of the state treasury, by appropriation or otherwise, "to any individual, on a claim, real or pretended, when the same shall not have been provided for by pre-existing law." TEX. CONST. art. III, § 44. We conclude that the appropriation does not violate this constitutional provision.

This office has construed article III, section 44 to preclude the legislature from appropriating funds unless the appropriation is authorized by pre-existing general law. *See, e.g.,* Tex. Att'y Gen. Op. Nos. JC-0146 (1999) at 3; H-1213 (1978) at 1; M-1068 (1972) at 5 ("It is settled as the law of this state that under the provisions of Section 44 of Article III of the Constitution of Texas, the legislature is prohibited from appropriating state money unless *at the very time* the appropriation is made, there is already in force some pre-existing valid law authorizing the appropriation.") (emphasis in original) (citing *Fort Worth Cavalry Club, Inc. v. Sheppard*, 83 S.W.2d 660, 663 (Tex. 1935)); *see also Bullock v. Calvert*, 480 S.W.2d 367, 371-72 (Tex. 1972) (holding that even if legislature had appropriated funds to officer for a particular purpose, officer must also have statutory authority to enter into contract for that purpose) (citing *Fort Worth Cavalry Club, Inc.*, 83 S.W.2d at 663). Most recently, in Attorney General Opinion JC-0146, this office concluded that a state university to which the legislature had appropriated funds to transfer to a private entity was precluded from transferring the state funds in part because the appropriation was not supported by substantive law, in violation of article III, section 44 and other constitutional provisions governing appropriations. *See* Tex. Att'y Gen. Op. No. JC-0146 (1999) at 5.

Here the contingent appropriation to the scholarship fund is supported by substantive law. The 1999 General Appropriations Act became effective on September 1, 1999. *See* House Bill 1, Act of May 26,1999, 76th Leg., R.S., ch. 1589, 1999 Tex. Gen. Laws 5446, 6348. The portion of House Bill 1248 adding section 7A to article 249a also became effective on September 1, 1999. *See* House Bill 1248, Act of May 27, 1999, 76th Leg., R.S., ch. 1371, §§ 1.10 (adding section 7A), 4.02

("This Act takes effect September 1, 1999."), 1999 Tex. Gen. Laws 4633, 4636-37, 4648. Thus, any appropriation made pursuant to the contingent appropriation on or after September 1, 1999, would be based on substantive law in force authorizing the appropriation.

Next you ask whether the Board may contract with a private, nonprofit organization to select scholarship recipients and disburse scholarship funds. *See* Request Letter at 3. You also ask if the Board may transfer the funds appropriated for scholarships to the private, nonprofit organization "in an amount equal to the scholarships awarded plus an administrative fee that does not exceed the 15 percent limitation." *Id.* Because we conclude that the Board lacks statutory authority to contract away its duty to administer the scholarship program, award scholarships, and disburse funds, we do not address the latter question.

The language of section 7A indicates that the legislature intended the Board itself to undertake the duty of administering the scholarship program, selecting scholarship recipients, and disbursing funds. *See, e.g.*, TEX. REV. CIV. STAT. ANN. art. 249a, § 7A(a) (scholarship fund an account in the general revenue fund "that may be appropriated *only to the Board* to: (1) provide scholarships to persons applying under Section 6(b) of this Act for examination; and (2) *pay the Board's* associated administrative costs."); (c) ("The Board may not use more than 15 percent of the amount appropriated to the Board [for the scholarship fund] *to pay the Board's administrative costs.*"); (f) ("*the Board shall consider* at a minimum the financial need of each person applying for a scholarship under this section") (Vernon Supp. 2000) (emphasis added). The Board suggests that it is authorized to contract with a private, nonprofit organization to select scholarship recipients and disburse the funds by subsection (f) of section 7A, which authorizes the Board to "establish and administer scholarships in a manner that the Board determines best serves the public purpose of the scholarships." *Id.* § 7A(f); *see also* Request Letter at 2-3 ("In order to implement Section 7A . . . in the most efficient manner, [the Board] wishes to contract with a private, nonprofit organization that will select scholarship recipients and disburse scholarship funds."). As discussed below, however, this language, which follows the legislature's public-purpose findings, authorizes the Board to impose limitations on scholarship awards to ensure that the public purpose of the scholarship program is achieved; this language does not authorize the Board to enter into a contract delegating to another entity its statutory duty to award scholarships and to disburse scholarship funds. Nor are we aware of any other provision in article 249a that provides statutory authority for such a contract.

By contrast, we understand that the Board contracts with a national testing service to examine applicants for registration. Article 249a expressly contemplates the Board's use of a national testing service in the examination of applicants. *See* TEX. REV. CIV. STAT. ANN. art. 249a, § 6(b) (Vernon Supp. 2000) (requiring Board to inform applicants of examination results within certain time frame unless "an examination is graded or reviewed by a national testing service," *id.* § 6(c), in which case the Board must provide information "not later than the 30th day after the date on which the Board receives the results from the testing service"). In addition, the 1999 General Appropriations Act appropriation for the Board contains a line item for the purchasing and grading of national examinations and riders regarding fee rates for national examination fees and an appropriation for

the Board to develop an in-state exam that is more cost-effective than a national standardized exam. *See* House Bill 1, Act of May 26, 1999, 76th Leg., R.S., ch. 1589, VIII-6-9, 1999 Tex. Gen. Laws 5446, 6146-49 (A.1.2. Strategy: National Examinations), (Riders 1 and 2: Fee rates for national testing), (Rider 5: Appropriation of unexpended balances for action plan related to cost benefit analysis of developing in-state exam).

Finally, we note that subchapter B of chapter 2254 of the Government Code generally authorizes a state agency to contract with consultants to study or advise the agency. *See* TEX. GOV'T CODE ANN. §§ 2254.021-.040 (Vernon 2000); *see also id.* § 2254.021(1) (defining "consultant service"). The general authority to contract with consultants for advice, *see, e.g.*, Tex. Att'y Gen. LO-97-035, at 7 (concluding that chapter 2254 authorized Texas Department of Health to commission market-need study from private consultant), does not authorize a state agency to contract away the final authority to make decisions regarding the expenditure of state funds. Thus, while subchapter B of chapter 2254 may authorize the Board to obtain advice from a private consultant regarding, for example, the selection of scholarship recipients, it does not authorize the Board to contract away the final authority to select scholarship recipients or disburse scholarship funds.

Your last question is whether a draft rule, which you enclose with your query, places sufficient controls on scholarship awards to satisfy article III, sections 51 and 52 of the Texas Constitution. *See* Request Letter (Attachment #1). Those constitutional provisions limit the legislature's authority to appropriate state funds to private individuals and corporations, either directly or by statutes authorizing expenditures by state or local entities. Section 51 provides that the "Legislature shall have no power to make any grant or authorize the making of any grant of public moneys to any individual, association of individuals, municipal or other corporations whatsoever." TEX. CONST. art. III, § 51. Section 52 prohibits the legislature from authorizing any political corporation or subdivision of the state "to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever." *Id.* § 52.

The purpose of article III, sections 51 and 52 is the same — to prevent the gratuitous application of public funds to private individuals. *See Byrd v. City of Dallas*, 6 S.W.2d 738, 740 (Tex. 1928); *Graves v. Morales*, 923 S.W.2d 754, 757 (Tex. App.–Austin 1996, writ denied). But the constitution does not bar a governmental expenditure that benefits a private interest if it is made for the direct accomplishment of a legitimate public purpose. *See Byrd*, 6 S.W.2d at 740. "A transfer of funds for a public purpose, with a clear public benefit received in return, does not amount to a lending of credit or a grant of public funds in violation of article III, sections 51 and 52." *Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 740 (Tex. 1995). For this reason, sections 51 and 52 do not preclude a state agency from making an expenditure of public money that benefits a private person or entity if the legislature determines that the expenditure serves a public purpose and places sufficient controls on the transaction to ensure that the public purpose is carried out. *See* Tex. Att'y Gen. Op. No. JC-0146 (1999) at 5 ("the legislature may not appropriate funds to a state agency to transfer to a private endowment unless the legislature (i) determines that the expenditure

serves a public purpose and (ii) requires the agency to place sufficient contractual controls on the transaction to ensure that the public purpose is carried out.").

As we have discussed, section 7A includes legislative findings regarding the public purpose of the scholarship program. Those findings indicate that the scholarships serve a public purpose of the state by promoting the professional needs of the state; increasing the number of highly trained and educated registered architects available to serve the residents of the state; improving the state's business environment and encouraging economic development; and identifying, recognizing, and supporting outstanding applicants who plan to pursue careers in architecture. *See* TEX. REV. CIV. STAT. ANN. art. 249a, § 7A(e) (Vernon Supp. 2000). We note that these benefits to the state presuppose that examinees will become licensed to practice architecture in Texas. The legislature has also authorized the Board to "establish and administer scholarships in a manner that the Board determines best serves the public purpose of the scholarships." *Id.* § 7A(f). This language authorizes the Board to place sufficient controls on the transaction to ensure that the public purpose is carried out. Thus, consistent with the mandates of article III, sections 51 and 52, the legislature has determined that the scholarships serve a public purpose and has authorized the Board to place sufficient controls on the scholarships to ensure that the public purpose is carried out.

In order for scholarship awards to pass constitutional muster, they must serve the public purpose identified by the legislature. In addition to its public-purpose findings, the legislature has provided in section 7A(f) that "[i]n determining what best promotes the public purpose, the Board shall consider *at a minimum* the financial need of each person applying for a scholarship." *Id.* (emphasis added). Section 7A(f) suggests that the legislature has determined that providing scholarships to needy applicants will serve the public purpose it has identified. Providing scholarships to needy applicants, who otherwise might have difficulty paying the examination fee and becoming licensed to practice architecture in the state, would appear to effectuate the public purpose identified by the legislature. The draft rule you have submitted requires that a scholarship recipient be a candidate in good standing and a Texas resident who has resided in Texas for at least a year and demonstrate that the examination fee would pose a financial hardship. *See* Request Letter (Attachment #1). In addition, the draft rule also requires a scholarship recipient to attain passing scores, *see id.*, which is a necessary condition for registration as an architect with the Board and to practice architecture in this state, *see* TEX. REV. CIV. STAT. ANN. art. 249a, §§ 1, 6 (Vernon Supp. 2000). We conclude that the draft rule, which requires scholarship applicants to demonstrate financial need and to attain passing scores so that they may be registered to practice architecture in Texas, is sufficient to ensure that the public purpose identified by the legislature will be achieved.

## S U M M A R Y

The legislative appropriation for the scholarship fund for architectural examination applicants established by section 7A of article 249a of the Revised Civil Statutes is supported by pre-existing law and therefore does not violate article III, section 44 of the Texas Constitution. The Texas Board of Architectural Examiners lacks statutory authority to enter into a contract with a private, nonprofit organization to select scholarship recipients and disburse scholarship funds. In order to ensure that scholarship awards satisfy the dictates of article III, sections 51 and 52 of the Texas Constitution, the awards must serve the public purpose identified by the legislature. The Board's draft rule is sufficient to ensure that the public purpose identified by the legislature will be achieved.

Yours very truly,

JOHN CORNYN
Attorney General of Texas

ANDY TAYLOR
First Assistant Attorney General

CLARK KENT ERVIN
Deputy Attorney General - General Counsel

ELIZABETH ROBINSON
Chair, Opinion Committee

Mary R. Crouter
Assistant Attorney General - Opinion Committee